# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEON WEINGRAD, individually and on behalf of all others similarly situated,<br><br><br>                                    Plaintiff,<br><br>        v.<br><br><br>TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC.<br><br>f/k/a "NATIONAL HEALTH ENROLMENT CENTRE"<br><br>                        Defendant. | Case No.<br><br>**2:23-CV-05114**<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
TOP HEALTHCARE OPTIONS INSURANCE AGENCY INC.'S MOTION TO DISMISS**

## I.   INTRODUCTION

Attempts by the robocalling industry to blame the victims of their calls for failing to allege "sufficient" facts to state a claim for direct liability because of actions those callers illegally take to conceal their identities and the source of the illegal calls they make are nothing new. Trial and appellate courts have had little trouble rejecting such tactics.

But now, it has come to this.

In its motion (ECF. No. 24, 24-1) ("Motion" or "Mot."), the Defendant makes a bold assertion, alleging that, despite being identified by its telephone carrier, via a subpoena, as the sender of each of the illegal calls complained of in Paragraph 30 of the Amended Complaint (ECF No. 12), despite the Plaintiff having answered one of the calls, and despite *each of the calls* going back to individuals who tried to pitch the Plaintiff health insurance, as alleged in Paragraph 28 of the original Complaint (ECF No. 1) and associated motion for subpoena (ECF No. 8, p. 2–3), the Plaintiff has somehow failed to allege that he received more than one call from the Defendant within a twelve month period for the purposes of a telephone solicitation as the TCPA requires. In so doing, it attempts to manufacture artificial doubt as to the clear purpose of the calls by citing to inapposite authority and completely ignoring the procedural history and posture of the case, which required two court orders to identify the Defendant, who illegally used the fake and fictitious name "National Health Enrolment Centre" on the calls.

Relatedly, the Defendant's claims that the Plaintiff's demands for injunctive relief and treble damages should be stricken turn a blind eye to the obvious: that the Defendant used an illegal name on the call but also used that to its own benefit, necessitating two courts orders and subpoenas to be issued to ultimately uncover the Defendant's true identity. Similarly, Defendant's claims that the Plaintiff has failed to state a claim under the Telemarketer Registration Act must fail because the law in this regard is still unsettled.

1

"Buried beneath the mummeries and straining-to-be-memorable passages"[1] of the
Defendant's Motion, there lies a boring ending and resolution: denial. The proper resolution of
Defendant's motion requires the Court to permit this case to proceed to discovery to test the
Plaintiff's claims because he has set forth a plausible claim for direct liability for multiple calls
against Defendant. The motion to dismiss is based on illogical assumptions that minimize the
Plaintiff's investigative pursuits while maximizing assumptions based on utterly false premises.
Defendant's motion should therefore be denied in its entirety.

## II.   FACTUAL BACKGROUND

The original complaint in this matter was filed on December 26, 2023 against a Doe
defendant, "National Health Enrolment Centre," based upon the Plaintiff's receipt of at least 26
automated telephone calls from a handful of caller IDs from the "National Health Enrolment
Centre," seeking to sell the Plaintiff health insurance. (ECF No. 1 ¶ 22). When each and every
single one of those numbers was called back, it was connected to agents who claimed to be
calling from the "National Health Enrolment Centre," also trying to sell health insurance (*Id.* ¶
28). Thereafter, the Plaintiff sought and obtained two court orders to identify the subscribers of
record for the numbers that called him by subpoena to the telephone carriers. The subpoena
responses issued as a result ultimately identified the Defendant, Top Healthcare Options
Insurance Agency Inc., as the entity that placed nine of the calls at issue, as articulated in the
Plaintiff's Amended Complaint. (ECF No. 12 ¶ 30). Most of these calls, admittedly, were missed
calls. However, the Plaintiff answered one of the calls, on December 15, 2023, from the caller ID
267-465-5198. (*Id.* ¶ 32). During that call, the Defendant was trying to sell the Plaintiff health
insurance using the same fake name, "National Health Enrolment Centre."

---

[1] *Obergefell v. Hodges*, 576 U.S. 644, 716 (2015) (Scalia, J., dissenting).

Defendant's instant motion follows. (ECF No. 24, 24-1). In it, the Defendant rests on inapplicable case law and faulty premises. Namely, the Defendant faults the Plaintiff at length for insufficiently and allegedly non-specifically alleging facts sufficient to give rise to the inference at the pleadings stage that the Plaintiff received multiple telephone solicitation calls from the Defendant. But those allegations are belied by calling the number back, the court orders and subpoena responses, the facts and circumstances surrounding the calls, and take advantage of the fact that the Defendant *illegally* concealed its identity by using a fake name. In so doing, any purported failure to plead additional facts resulted solely form the Defendant's own misconduct at hiding the source of the calls. This response follows.

### III.   LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (cleaned up). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–87. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed

only where it appears that there are not "enough facts to state a claim that is plausible on its

face," not merely because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570.

### IV.   ARGUMENT

*A.   The Plaintiff has alleged that he received nine calls from the Defendant, which were evidently made to sell him health insurance. No further pleading is required.*

In essence, the Defendant attempts the classic "we didn't do it" defence by disguising it

as a challenge to the Plaintiff's allegations at the pleadings stage. In so doing, the Defendant

points to the TCPA's requirement that the Plaintiff must receive "more than one telephone call

within any 12-month period by or on behalf of the same entity." 47 U.S.C. § 227(c)(5). The

Plaintiff has unquestionably done so, identifying nine such calls which were placed to his

telephone number on the National Do Not Call Registry without consent. (ECF No. 12 ¶ 30, 20,

27). Indeed, the Plaintiff had no business relationship or previous dealings with the Defendant

whatsoever. (ECF No. 12 ¶ 25). Most of those calls were admittedly missed calls, but the

Plaintiff answered one of them and spoke with an agent who claimed that they were with the

fictitiously named "National Health Enrolment Centre" and attempted to sell him health

insurance. (*Id.* ¶ 32). Later calls back revealed the same. It should also be noted that all of the

calls were placed during ObamaCare's Open Enrolment period, the only time of the year when

Americans can sign up for health insurance, which lasted from November 1, 2023 through

January 16, 2024. *See A Quick Guide to the Health Insurance Marketplace*, DEPT. OF HEALTH &

HUMAN SERV'S, https://www.healthcare.gov/quick-guide/dates-and-deadlines/.

The Court's analysis can end there. The Plaintiff has unquestionably pled that he received

nine calls by the same entity–the Defendant–within a twelve-month period, to his number on the

National Do Not Call Registry. The purpose of these calls was clearly to sell the Plaintiff health

insurance during open enrolment. The Court need not require the Plaintiff to answer every call,

let alone play along or purchase from the caller, to ascertain this well-pled fact. Instead, it can draw reasonable inferences. The Plaintiff received nine calls from the same entity, but from different phone numbers. Those calls were placed during open enrolment. The one call the Plaintiff answered was made to solicit him for health insurance. When the telephone numbers are called back, they all go to agents of the "National Health Enrolment Centre" who all are looking to sell health insurance. Court orders and subpoenas identified the Defendant as the subscriber of record for each of the numbers complained of. It therefore makes sense that the unanswered calls were made to sell the Plaintiff health insurance as well.

The Defendant's counter-inferences, which it isn't even permitted to bring up at the pleadings stage, belie logic and common sense. If the agents who identified themselves as calling from the "National Health _Enrolment_ Centre" were not calling to enrol the Plaintiff in health insurance, then what were they doing incessantly calling the Plaintiff? There is no other plausible reason, and Defendant has certainly not advanced any, for why the Defendant would cold call the Plaintiff at least nine times in the span of two days _other than_ to sell the Plaintiff health insurance, let alone any other legitimate non-solicitation purpose. To that end, the Defendant's reliance on and mischaracterization of _Gillam v. Reliance First Cap._ is off base and completely ignores the additional facts, realities, and inferences of _this_ case.

In _Gillam_, the plaintiff did not answer _a single one_ of the calls alleged to have originated from the defendant until he answered an eighteenth call, during which he "spoke to an agent who was soliciting refinancing products." _Gillam v. Reliance First Cap., LLC_, No. 21CV4774JMAJMW, 2023 WL 2163775, at *1 (E.D.N.Y. Feb. 22, 2023). And the Court in that case, despite acknowledging that courts in TCPA cases often permit plaintiffs to plead additional facts when allegations are deemed deficient, strangely concluded that because the plaintiff did

not engage with the caller on the previous calls, he therefore could not plead that the seventeen previous calls were solicitations, stating that "Gillam did not actually <u>engage</u> with any of RFC's purported representatives until the August 4, 2021 call." *Id.* at *3 (emphasis in original). In so doing, the Court concluded that the plaintiff there pled no additional facts which would allow the court to conclude or reasonably infer that the content of the other calls were solicitations. *Id.*

Furthermore, the Court's conclusion in *Gillam* appears to have been driven partly by the fact that the plaintiff in *Gillam* appears to have had an *established business relationship* with the defendant, who also identified itself using its *real name* and *business telephone number*, thereby raising the inference that other calls from the defendant may not have been for solicitation purposes, but potentially for other purposes, such as account servicing. *See id.* ("Indeed, the Complaint does not allege that: (1) Plaintiff had not previously invited or permitted Defendant to call him and that (2) he and RFC lacked an "established business relationship" prior to the receipt of any calls from RFC's agent(s).").

A number of factors render *Gillam* distinguishable from here. First, and most importantly, each of the numbers here, when called back, led back to agents with the "National Health Enrolment Centre," who *try and sell health insurance*, as contrasted to *Gillam*, where there was *no engagement* with the Defendant apart from the one call. As previously mentioned, the calls occurred during open enrolment, the only time of the year when insurance agencies can sell health insurance. The Plaintiff answered one of the calls and confirmed the purpose of the call was to sell him health insurance. The Defendant is a healthcare insurance agency that sells health insurance. Also, unlike in *Gillam*, the Plaintiff here has explicitly pled the absence of an existing business relationship or consent, thus foreclosing the possibility of other potential reasons why the Defendant might be contacting the Plaintiff, such as to follow up on an existing

account, for a survey, or to track down a missing payment. The Defendant also used a fake name and multiple phone numbers to avoid detection in its TCPA-violative conduct, actions which a legitimate business would never take with an existing customer or if it was calling for legitimate non-telemarketing purposes. For what it's worth, if the call was not a solicitation, the caller would also likely have left a message describing its purpose and any action required.

One questions why the Defendant here took steps to remain anonymous, including by using various telephone numbers which are all not readily or easily identified as being related to its company, as contrasted to the defendant in *Gillam*, who used its real name and public 800-callback number. Perhaps most foreclosing the Defendant's argument here, the Defendant subscribed to all of the multiple telephone numbers described in the Amended Complaint through a service named Convoso, "a manufacturer and seller of turnkey artificial intelligence automated contact centre software used by businesses, like the Doe Defendant, to market their products and services via telephone" (ECF No. 10, p. 1). Convoso is "a leading contact center software provider (CCaaS) *for sales and lead generation* teams." (*Id.* p. 1–2) (emphasis added).

Indeed, the Defendant itself was recently featured as a *case study* for how Convoso led to a 1000% increase in *outbound calls to sell insurance*, including by being able to send out calls with hundreds of sales agents and capture call backs and missed calls. *Top Healthcare Options, Convoso Customer Success Story*, Convoso (Nov. 2020), https://www.convoso.com/wp-content/uploads/2020/11/Top-Healthcare-Options_Convoso-Customer-Success-Story.pdf [https://archive.is/PEeGG]. If the calls were not placed as telephone solicitations, why were they sent using a telephone provider that specializes in software and telephone service for sales and lead generation that itself used the Defendant as a case study?

While taking all factual inferences in the Plaintiff's favour, as the Court must do now, the

Plaintiff's allegations are sufficient. As Judge St. Eve, prior to President Trump appointing her to

the Seventh Circuit Court of Appeals, held in a TCPA case denying a similar motion to dismiss:

> Sempris . . . contends that Toney "cannot plausibly allege that the three unanswered calls she purportedly received were initiated by Quality for the purpose of marketing Sempris's Budget Savers membership program, because Toney does not allege--and cannot allege-- that she has any personal knowledge of what the content of those calls would have been." Sempris submits that Quality "just as easily could have been calling Toney to market the goods or services of another company it contracts with, for the exclusive purpose of confirming Toney's Stompeez order, or for a different purpose altogether" and that "Toney's assertion that that Quality made the three unanswered calls for the purpose of marketing Budget Savers is nothing more than rank speculation."

> *The court disagrees*. Toney has alleged that she received and answered a call from Quality in which the caller tried to sell her a Budget Savers membership the day after she received three unanswered calls from Quality. The content and timing of the fourth call allows the court to draw a reasonable inference that Quality made the first three calls to market Sempris's services.

*Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (cleaned up). Other courts

have similarly held.  For example, in *Bird v. Pro Star Builders, Inc.,* No. 2:22-cv-03610-JLS-

JEM, 2022 U.S. Dist. LEXIS 215155, at *7-8 (C.D. Cal. Nov. 28, 2022), which itself cited to

other similar decisions, the court held:

> [I]t is reasonable to infer that Pro Star was responsible for the alleged February 24 unanswered call from the same number as the second call on April 19. Indeed, courts in other districts have recently found that a plaintiff has sufficiently alleged multiple calls from the same entity when he or she received more than one call from the same number but traced the calls back to the defendant after having answered only once. *See, e.g., Chapman v. Nat'l Health Plans & Benefits Agency, LLC*, 2022 U.S. Dist. LEXIS 138916, 2022 WL 3130225, at *7 (E.D. Mich. Aug. 4, 2022) (finding that plaintiff plausibly pleaded that four calls—including three unanswered calls—had come from the same defendant because they had originated from the same number and the plaintiff alleged that other individuals had complained about receiving solicitations from that number); *Spurlark v. Dimension Serv. Corp.*, 2022 U.S. Dist. LEXIS 120468, 2022 WL 2528098, at *3 (S.D. Ohio July 7, 2022) (finding that plaintiff who had ignored multiple calls from the same number until he answered and was able to identify the caller plausibly pleaded that the calls were all placed by the defendant). The Court agrees that it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not. Accordingly, the Court finds that Plaintiff has plausibly alleged that the two calls at issue came from Pro Star.

This Court should hold the same, in line with the authority cited above. And though the Caller ID

was not the same for each of the calls as in *Bird*, the Plaintiff has stronger evidence here – a subpoena response from Convoso identified all numbers as belonging to the Defendant.

The Defendant's motion is also internally inconsistent. For example, the Defendant claims it obtained purported consent to contact the Plaintiff. (Br. at p. 3). But if the Defendant possessed purported consent to make calls, what was that consent obtained for? Consent is only necessary to make solicitation calls. If the Defendant had a previous business relationship, as in *Gillam,* or some legitimate non-solicitation reason to contact the Plaintiff, it would have no need for consent. The TCPA requires no consent for existing business relationships, nor does it require consent to make manual calls for non-telemarketing purposes. Clearly, the Defendant obtained any purported consent in order to make telemarketing calls, of which it made nine.

Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint or for determining whether the plaintiff has any evidence to back up what is in the complaint. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). However, that's precisely what the Defendant attempts to do here, making a red-herring argument that the Plaintiff has failed to state a claim because he has allegedly failed to set forth facts regarding the other eight calls, even in light of the other facts and inferences that this Court can and must draw from the Plaintiff's well-pled allegations that show that those calls were also placed as telephone solicitations. In sum, Defendant points to a "red herring" that begs the question "what for, then?" *See Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687, at *6 (E.D. La. Feb. 6, 2013). Nevertheless, the Plaintiff has met his burden of pleading facts sufficient to give rise to the inference that each of the nine calls were telephone solicitations.

The Defendant's "the other calls weren't solicitations" argument is more properly the subject of a jury trial or at the very least a motion for summary judgment. The details

surrounding the calls, the systems used to place them, and the Defendant's own illegal conduct, are more than sufficient to put Defendant on notice of the claim being asserted and that it is alleged to have made nine telemarketing calls directly to Plaintiff at the pleadings stage. Tellingly, the Defendant does *not* have any explanation for why it used an illegal fake name, why it used marketing software to place the calls, why it claims to have obtained consent, why the numbers all go to agents selling health insurance when called back, or why the call the Plaintiff answered was made to sell the Plaintiff health insurance.

For all intents and purposes, Defendant attempts a smoke-and-mirrors game of purported deficiencies in the complaint in an ill-contrived effort to escape liability under the TCPA. Defendant, and only the Defendant, is in the best, and only, position to identify any contrary facts which would explain an alleged non-solicitation purpose for calling the Plaintiff nine times. It has not done so and instead elected to throw all its efforts into moving to dismiss the complaint based on allegedly inadequate allegations which were concocted entirely by the Defendant. Defendant cannot be permitted to play games in such a manner.

Defendant cannot overcome the Plaintiff's plausible inferences by rank speculation. But the bulk of the Defendant's motion does so by relying on its own misconduct and the fact that the Plaintiff only answered one call to pull the wool over the Court's eyes in a vain attempt to convince this Court that the Plaintiff has not pled sufficient facts for the purpose of the other calls. It does so despite the aforementioned smoking-gun evidence that would allow this Court to draw that inference. All the Defendant's motion does here is impermissibly speculate as to why the various factual allegations in the Plaintiff's complaint are insufficient to draw inferences as to the purpose for the eight calls. But, as described above, the Plaintiff has plausibly alleged why it is eminently reasonable to conclude that the eight other calls were placed for telemarketing

purposes and eminently unreasonable to conclude otherwise. Were this the case, any would-be telemarketer could simply sidestep the TCPA's prohibition against calling numbers on the Do Not Call Registry by making hundreds of unanswered calls and then ceasing calling conduct after the purpose of the call was identified.

Congress surely could not have intended such an absurd result. The factual attacks here do not mandate dismissal. Instead, the motion attacks Plaintiff for facts that could have existed but didn't. Should this Court at all find the Plaintiff's pleading in this regard at all deficient or contradictory, the Court only need give the order granting the Plaintiff leave to amend and he will do so to rectify any perceived deficiency, including providing more details on the call he answered and the later calls back to the numbers, where the agents stated the purpose of the calls was to sell insurance.

**B.** *The Defendant's unlawful conduct, including using an illegal fake name, refusing to identify itself, and using multiple phone numbers, necessitating two court orders and subpoenas to identify Defendant, unquestionably demonstrate both that an injunction is warranted and "knowing" and "wilful" violations of the TCPA.*

Defendant also moves on interrelated grounds to dismiss the Plaintiff's claims for injunctive relief and treble damages under the TCPA. Specifically, Defendant argues Plaintiff has not shown any risk of future injury to warrant standing for injunctive relief, nor any facts that would warrant a finding of "knowingness" or "wilfulness" such as to justify the imposition of treble damages under the TCPA.

Yet Plaintiff's allegations do establish a risk of future injury. As an initial matter, the Plaintiff notes that the Defendant improperly asserts its challenge as to the Plaintiff's *standing* to bring a request for injunctive relief under Rule 12(b)(6); instead, such motion is more properly brought under Rule 12(b)(1), thus providing an independent basis for denying it. *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). Regardless, there unquestionably

remain risks of future harm. The subpoena responses from the telephone provider and Convoso identifying the Defendant's phone numbers seem to indicate that the telephone numbers associated with the Defendant are still in Defendant's active account with Convoso, meaning that the Defendant can, and likely is, still sending out calls on those numbers. Indeed, Defendant features prominently and continues to feature prominently in Convoso's marketing. The Plaintiff alleged that Defendant continues to make illegal calls. (Am. Compl. ¶ 55). Moreover, the Court can take judicial notice of continuous complaints from individuals as recently as September 7, complaining of "incessant" calls from the "National Health Enrollment Center." *See National Health Enrollment Center*, PɪssᴇᴅCᴏɴsᴜᴍᴇʀ (Sept. 7, 2024), https://national-health-enrollment-center.pissedconsumer.com/review.html#reviews [https://archive.is/nUakH].

More importantly, Plaintiff has also alleged that the Defendant has used and will continue to use the fake name "National Health Enrolment Centre" in the absence of an injunction. (Am. Compl. ¶ 6, 18, 55). Defendant has not confirmed that it is now using its real name to contact individuals, as the TCPA requires, nor has the Defendant taken steps to rectify its use of a fake name by registering the fictitious name "National Health Enrolment Centre." Nor has the Defendant registered such fictitious name, let alone its real business name, with the Attorney General of Pennsylvania. As such, an injunction is necessary to stop the aforementioned illegal conduct. These allegations plausibly establish a risk of future harm. As a telephone user, Plaintiff is at risk of future telemarketing calls from Defendant and is at risk of future calls from Defendant's fake name. Defendant presents no facts or arguments whatsoever rebutting the risk of such calls from Defendant in the future and does not even admit that it is knocking it off.

And, though the Plaintiff alleges future harm, he is not required to:

The Telephone Consumer Protection Act, 47 U.S.C. § 227 (b)(3), creates a private right of action and allows a Court to order injunctive relief, monetary relief, and treble damages.

> Plaintiff is not seeking a preliminary injunction, which would require a showing of likelihood of success on the merits and irreparable harm. Defendant argues that Plaintiffs allegations do not suffice to establish either prong, and are inadequate to state a claim for treble damages. . . . In *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004), the Eleventh Circuit differentiated statutory and non-statutory injunctions. . . . Where plaintiff sufficiently alleges a claim for a statutory violation, that is all that is required to request injunctive relief in a complaint.

*Gutierrez v. Fla. Advert. & Mktg. Corp.,* 387 F. Supp. 3d 1410, 1411 (S.D. Fla. 2019).

Other federal courts in Pennsylvania have explicitly rejected the Defendant's authorities cited to here. Indeed, the Court in *Abramson v. AP Gas & Elec. (PA), LLC*, No. 22-1299, 2023 U.S. Dist. LEXIS 18996, at *14-15 (W.D. Pa. Feb. 6, 2023) denied a similar motion to dismiss:

> Here, along with allegations that AP Gas is aware of the requirements of the TCPA, Abramson alleges the elements of a TCPA claim to satisfy a demand for injunctive relief: (1) ongoing telemarketing by AP Gas using automated calls to send prerecorded messages; (2) Abramson's receipt of at least eleven prerecorded calls from AP Gas between August 9 and 18, 2022, without his consent; and (3) injury in the form of disturbed solitude and annoyance as well as being temporarily deprived of the use of his phone. ECF No. 1 ¶¶ 19-21. These allegations adequately place him within the zone of interests protected by the TCPA, and allege a pattern and practice by AP Gas of violating the TCPA. These allegations are accepted as true, and permit an inference of future violations that the TCPA seeks to enjoin.

This Court should hold the same just as the sister Court in *Abramson*.

The Court should also do the same with respect to Plaintiff's request for treble damages. Defendant knew what it was doing was illegal, so it illegally used a fake name during the calls to minimize the risk of getting caught. 47 C.F.R. 64.1200(d)(4). The TCPA provides for treble damages for any entity violating the TCPA "knowingly" or "willfully." Here, the Plaintiff pleads far more than what the Defendant claims is necessary for a holding that the Defendant violated the TCPA in this matter. For example, the Plaintiff pleads the illegal use of a fake name multiple times in his amended complaint. (Am. Compl. ¶ 18, 31, 32). Moreover, in Plaintiff's motion for discovery, the Plaintiff outlines this illegal conduct in greater detail, including the fact that the Defendant "banned" callers who called back if they asked too many questions or were unable to

make a sale, thus further hampering Plaintiff's counsel's investigative efforts. (ECF No. 8, p. 2). Defendant also did not register its caller ID and took steps to scrub the telephone numbers it was using to call people from Google. (*Id.* p. 6).

Defendant's argument ignores the specificity of the Plaintiff's allegations, including those in his discovery motion. In sum, the Defendant refuses to acknowledge the fact that it *knew* what it was doing was illegal by failing to mention any of the pleadings outlining the multiple steps Defendant illegally and affirmatively took to hide its identity, necessitating the issuance of two court orders and subpoenas. The fact that Defendant evaded detection for the better part of six months is a testament to how well the Defendant's efforts were in evading detection and ducking its liability under the TCPA. Defendant's motion in this regard is a textbook example of the pot calling the kettle black, being blind to its use of a fake name and other techniques to hide its identity, duck TCPA liability, and avoid ill will for its brand, necessitating treble damages.

In interpreting the wilful or knowing standard, courts require only that a party's actions were intentional, not that it was aware that it was violating the statute. *See, e.g.*, *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014) ("willful or knowing violation of TCPA requires only that defendant know of the facts constituting the offense"); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 37310 (N.D. Ill. Mar. 19, 2013) ("[T]he Court adopts the more common interpretation that 'willfully' or 'knowingly' simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute."). The aforementioned allegations plainly demonstrate that the Defendant was taking intentional actions, including to hide its identity. The Defendant cannot credibly allege that its actions in making calls with fake names and multiple anonymous telephone numbers were at all inadvertent. Rather, they are explicit and deliberate.

Furthermore, the Defendant has previously been on notice for violations of the TCPA. While discovery will further reveal the specifics regarding these alleged violations, the Plaintiff has plainly alleged with specificity that Defendant (a) engages in telemarketing to generate new customers, (b) it illegally used a fake name to do so, (c) used multiple anonymous telephone numbers to do so, and (d) did so with respect to the Plaintiff. Such allegations are more than sufficient to put Defendant on notice of the potential for the fact that a fact finder can determine that a violation of the TCPA was done in a "knowing" or "wilful" manner.

C.   *The Plaintiff has pled a claim under the Pennsylvania Telemarketer Registration Act, and the issue of whether or not the PTRA provides a private right of action under the UTP/CPL is a matter of unsettled law.*

Defendant's claim that there is no private right of action under the Pennsylvania Telemarketer Registration Act, as explicitly authorized by the PTRA as constituting a predicate claim under the Unfair Trade Practices and Consumer Protection Law, or UTP/CPL, is not as well-settled as the Defendant claims. *Compare Perrong v. Brief Call, Inc.*, 2024 U.S. Dist. LEXIS 61653, at *25 (S.D.N.Y. Mar. 29, 2024) (denying motion to dismiss and allowing PTRA-UTP/CPL claim to proceed); *Bower v. Nat'l Admin. Serv. Co., LLC*, No. 4:21-CV-00998, 2022 U.S. Dist. LEXIS 48027, at *4 (M.D. Pa. Mar. 17, 2022) (same); *with Shelton v. FCS Cap. LLC*, 2019 U.S. Dist. LEXIS 213179, 2019 WL 6726404 (E.D. Pa. Dec. 11, 2019) (dismissing case because plaintiff did not plead predicate UTP/CPL claim).

There is no private right of action explicitly under the PTRA. However, our Commonwealth Court has already held that a violation of the PTRA constitutes a violation of and is a *predicate claim* under the UTP/CPL. *Comm. v. Peoples Benefit Servs.*, 923 A.2d 1230, 1238 n.15 (Pa. Commw. Ct. 2007). And the UTP/CPL unquestionably provides for a private right of action. 73 PA. CONS. STAT §201-9.2(a). Unlike in *Shelton*, Plaintiff has pled the requisite

15

predicate claim. (Am. Compl. ¶ 64). The Defendant, however, argues that because the Plaintiff

has not pled that he actually *purchased* the healthcare plans that Defendant was seeking to sell,

the Plaintiff has not "suffere[d] any ascertainable loss of money or property, real or personal, as a

result of the use or employment by any person of a method, act or practice declared unlawful," as

required by the UTP/CPL. *See id.*

But that reading is at odds with the statutory text. It would be downright peculiar for the

General Assembly to provide for a private right of action under the PTRA through the UTP/CPL

if it *also* required the purchase of goods or services directly from a telemarketer who was *already

breaking the law*. *See Eck v. Metro. Life Ins. Co.*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 764, *28

n.15, 2006 WL 6346564 (stating the PTRA's goal is to protect consumers and requires a lower

standard of proof). The primary case upon which Defendant relies for this proposition is *Perrong

v. CMI Mktg. Rsch. Inc.*, No. 22-3733, 2023 U.S. Dist. LEXIS 171839, at *8 (E.D. Pa. Sep. 26,

2023), a case where the plaintiff brought suit against a company making survey calls, which the

plaintiff argued were a pretext for the later sale of goods and services. *Id.* But because the

plaintiff did not identify the *specific goods and services* alleged to have been solicited, the Court

in *CMI* held that there was no predicate claim for the PTRA under the UTP/CPL for the survey

calls because the UTP/CPL applies only to a person who "'purchases or leases goods or services

primarily for personal, family or household purposes and thereby suffers any ascertainable loss

of money or property, real or personal' as a result of covered unlawful practices." *Id.*

But this Court in *CMI* did not have occasion to address whether the *real harms* that the

Plaintiff here has alleged, namely, the occupation of "telephone lines, storage space, and

bandwidth, rendering them unavailable for legitimate communication, including while driving,

working, and performing other critical tasks," not to mention the expenses incurred in seeking

two court orders and serving subpoenas to identify the Defendant, constitute an "ascertainable loss of money or property" as a result of the illegal conduct alleged. Especially with respect to the latter, it is unquestionable that the Plaintiff *has* suffered an ascertainable loss through *its very failure to register as a telemarketer*, an act which the PTRA explicitly makes unlawful under the UTP/CPL. If the Defendant had registered as a telemarketer, the Plaintiff or his counsel could simply query the Attorney General to ascertain who was using the fictitious name "National Health Enrolment Centre." But because the Defendant used such a fake name, the Plaintiff was forced to seek court orders and subpoenas to uncover this information.

Thus, the Defendant's contention that the Plaintiff has not suffered an ascertainable loss as a result of its efforts to sell goods and services in the form of health insurance is plainly false. As an initial matter, the Plaintiff has suffered an ascertainable loss because the Defendant took steps to conceal its identity, one of the aims that registration as a telemarketer was designed to combat. But even putting these damages aside, just because calculating the damages incurred by the occupation of telephone lines, storage space, and bandwidth in an effort to sell health insurance is difficult, it does not mean that those damages are unascertainable, nor do these pleadings constitute an "intangible, non-specific, and non-concrete" loss. Indeed, addressing a similar argument that South Carolina telemarketing law required pleading actual damages, Court rejected Defendant's very argument on the basis of the following analysis. *See Keller v. Prosperity Home Mortgage*, No. 6:23-cv-05048-TMC, ECF No. 44 (D. S.C. Apr. 19, 2024).

Like a fire, receiving a telephone call doubtless requires three elements, absent any one of which a telephone call cannot occur: a telephone, a source of power, and the voice data and associated call log data itself. An illegal telemarketing call to sell health insurance, as here, although *de minimis*, deprives the recipient of the call of all three. Moreover, it is possible to

calculate the harm to each class member resulting from the deprivation of each of these three elements and thereby prove such "ascertainable losses" mathematically. Although such calculation will likely require Plaintiff to employ a damages expert to review the discovery and determine with greater precision, the actual losses of each class member are capable of mathematical proof based on back-of-the-envelope calculations. For the following calculations, permit the Court to assume that each member of the class received nine calls from the Defendant, each lasting a minute.

Let's start with the telephone used to receive the calls themselves. Industry statistics reveal that the average life of a smartphone is 2.5 years. Kim Komando, *How Long Before a Phone Is Outdated? Here's How To Find Your Smartphone's Expiration Date.*, USA TODAY (Oct. 22, 2023), https://www.usatoday.com/story/tech/columnist/komando/2023/10/22/how-to-find-smartphone-expiration-date/71255625007/. Furthermore, a new iPhone with mid-range storage options will cost approximately $1,500 after accounting for sales taxes, accessories, and fees. *Buy iPhone 15 Pro*, Apple, https://www.apple.com/shop/buy-iphone/iphone-15-pro [https://archive.is/VGLsC]. Therefore, each minute of smartphone ownership costs approximately .114 cents, or $0.01026 for the calls class members received.

Next, power. The latest iPhone, with the latest, most efficient battery technology, has a practical runtime of 11 hours on average. *See Best iPhone Battery Life Ranked [2023]*, SMARTY BLOG, https://smarty.co.uk/blog/best-iphones-battery-life/ [https://archive.is/38gdX]. And, assuming a 20 watt charger operating at 70% efficiency, that battery will take about two hours to fully charge, rendering a charge power consumption of 0.052 Kilowatt Hours. And, according to the Energy Information Administration, the average electricity cost for Pennsylvania is 17.68 cents per Kilowatt Hour, resulting in a cost of $0.0091936 to charge an

iPhone from empty to full. Thus, the operating cost in power for an iPhone for nine minutes is $0.000125367272727273.

Finally, the big one: data. Practically every smartphone today uses a technology called Voice Over LTE to place telephone calls, which sends a telephone call over a cell phone's data connection, instead of the older voice-dedicated cell towers. Samuel Contreras, *VoLTE: How To Use It and Why You Should Care*, ANDROIDCENTRAL (Dec. 19, 2022), https://www.androidcentral.com/volte. Voice Over LTE using so-called "HD Voice," in reality, 3GPP TS 26.441 ("EVS") operates at a maximum theoretical bandwidth of 128 kilobits per second, or about 1 megabyte per minute. Thus, nine voice-based telemarketing calls lasting a minute each will use about 9 megabytes of mobile data. They will also use up about two kilobytes of storage space for the calling record itself, even if the call is not answered. And some of the cheapest mobile data plans, like Mint Mobile, still cost $15 for 5 gigabytes of data, or $0.003 per megabyte. Thus, each class member who received three calls sustained an almost 3 cent hit to their wallet as a result of the nine telemarketing calls.

Adding these numbers together reveals that a putative class member who received nine one-minute long telemarketing calls from the Defendant to sell insurance sustained ascertainable losses of approximately 3.73 cents. Those losses can be more precisely calculated through expert analysis of the duration of the calls and class members' reporting of their cell phone models and age. Now, this Court need not be startled by the relative paucity of the above-mentioned figures. Judge Pratter, of blessed memory of this Court, held *that 1.7 cents* of actual damages was sufficient to state a TCPA claim. *Perrong v. Victory Phones LLC,* No. CV 20-5317, 2021 WL 3007258, at *7 (E.D. Pa. July 15, 2021) ("[I]t is that economic loss (to say nothing of the associated annoyance) that the TCPA unambiguously seeks to rectify. The TCPA does not

19

contain a 'de minimis' charge below which a plaintiff cannot state a claim.").

In fact, *de minimis* damages are the *touchstone* for determining the superiority of a class action. It is practically impossible that a class member would bring an action individually and pay the filing fee to recover 3.73 cents in actual damages or even $100 in statutory damages. But pennies add up, and that's what makes the class action mechanism so powerful. *See* William B. Rubenstein, 2 *Newberg on Class Actions* § 4:87 (5th ed.) (noting superiority requirement is met in class actions involving small claims because "[i]n such cases, there will either be a class action or there will be no litigation"). This is the exact reasoning adopted by the Fourth Circuit in *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655–56 (4th Cir. 2019) ("[T]he liability determinations involve no questions of individual reliance [and] the damages calculations do not turn on individual evidence.").

Though *de minimis*, the damages here are ascertainable losses mathematically capable of proof. Neither the Plaintiff nor the class seek recovery for annoyance, emotional distress, or other imprecise harms. To the extent that they will be required to plead an ascertainable loss to state a claim under the UTP/CPL, the Plaintiff and the class have calculable damages capable of classwide, mathematical proof. The Plaintiff has therefore unquestionably pled an ascertainable loss of property as a result of the Defendant's violation of the PTRA and he, and every class member, is therefore entitled to his actual damages or $100–$300 under the UTP/CPL.

## V.   CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent that the Court finds that additional questions remain, it should permit the Plaintiff to amend to correct the deficiencies as necessary.

Dated: September 10, 2024

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

September 10, 2024

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com